# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

INTERNATIONAL PRODUCTION SPECIALISTS,

        **Plaintiff**

   **v.**                                      **Case No. 05-C-621**

SCHWING AMERICA,

        **Defendant.**

---

 SCHWING AMERICA,

        **Counter Claimant,**

   **v.**

INTERNATIONAL PRODUCTION SPECIALISTS,

        **Counter-Defendant.**

---

## DECISION AND ORDER

---

        The action arises from a subcontract between the Plaintiff and Counter-Defendant, International Production Specialists ("IPS"), and the Defendant and Counter Claimant Schwing American ("Schwing"). In 2001, IPS agreed that it would fabricate and install five silos for Schwing at a wastewater treatment plant in Waukegan, Illinois owned by the North Shore Sanitary District ("NSSD"). The contract proceeded smoothly until the plant project was halted

by the NSSD and, after two years of dormancy, resumed at a new, Zion, Illinois site. IPS continued its work after agreeing to an August 12, 2004, change order with Schwing.

The action, filed by IPS in the Circuit Court for Racine County, Wisconsin, was removed to this district by Schwing. Removal jurisdiction is predicated upon 28 U.S.C. § 1332 because the two corporations are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Venue in this district is based on 28 U.S.C. § 1391(a)(2).

IPS brought this breach of contract action claiming that Schwing lacked cause for its cancellation of the August 12, 2004, change order and that Schwing is liable for IPS's resultant damages. Schwing counterclaims that IPS breached the terms and conditions of Schwing's August 20, 2001, purchase order and its August 12, 2004, change order and, therefore, Schwing justifiably cancelled the contract by letter dated February 11, 2005. Schwing maintains that IPS is liable for substantial damages incurred by Schwing due to IPS's defective performance and the associated delays.

The matter was tried to the Court on November 27, and 28, 2006. IPS submitted a post-trial brief applying Wisconsin contract common law. Schwing submitted a post-trial brief applying Article 2 of the Uniform Commercial Code ("UCC") governing the sale of goods as set forth in Seventh Circuit Court of Appeals' case law.

Since neither party addressed the choice of law issue, the Court allowed the parties an opportunity to submit supplemental briefs addressing whether Article 2 of the UCC was applicable to the transaction. Those briefs have been filed and the matter is ready for

2

decision. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court sets forth its findings of fact and conclusions of law.

## *Findings of Fact*

In 2001, Voest-Alpine Industries, Inc. ("VA Tech") entered into a $6.6 million contract with the NSSD to do work in conjunction with the construction of a wastewater treatment facility. VA Tech employee, Brian Crandall ("Crandall"), a mechanical engineer, was the project manager until April of 2005.

On June 28, 2001, VA Tech entered into a $1.255 million subcontract ("VA Tech-Schwing contract") with Schwing,[1] a Minnesota corporation with its principal place of business in White Bear, Minnesota, to supply and install five silos, hydraulic pumps, and associated equipment for the NSSD facility. (Ex. 1002.) The purchase order between VA Tech and Schwing incorporates specifications for two receiving bin silos (B1610 & B 2610), two wet sludge silos (B1710 & B2710), a dry granules silo (B1550) (collectively the "five silos"), and the technical supplies for the welded components. (*Id*.) Pursuant to the terms of its contract with VA Tech, Schwing obtained a performance bond.

Nancy Predatsch ("Predatsch"), the operations manger of Schwing's Danbury, Connecticut office, was responsible for overseeing the subcontract. Franz Tillman ("Tillman"), was Schwing's project engineer. Until July 2004, Schwing's project manager was David Miller

---

[1]Schwing's material handling division supplies equipment and services to the wastewater treatment industry in the United States.

("Miller"), a certified millwright. Richard Janke ("Janke"), who was employed at Schwing's Minnesota office, was also responsible for overseeing the work on the job site.[2]

Predatsch decided that Schwing should engage a local contractor to fabricate the five silos. Schwing located IPS, a Wisconsin manufacturer of construction equipment including standard and custom built bulk material handling equipment, by means of IPS's website. (Ex. 1003). IPS is a Wisconsin corporation with its principal office located in Honey Creek, Wisconsin. The parties had no prior dealings.

After being contacted by Schwing, IPS and Schwing engaged in negotiations which lead to Schwing's issuance of a $666,372 purchase order number 1068936 dated August 20, 2001, ("Schwing-IPS purchase order") for the five silos[3] and their installation at the NSSD's Waukegan site. (Ex. 2.) The purchase order specified two receiving bin silos, two wet sludge silos, and a dry granules silo consisting of a conical portion, with a downward facing cone, supported by legs. (*Id*.) The wet sludge silos were more than twice the size of the dry granules silo. The purchase order between Schwing and IPS expressly incorporated the specifications for the five silos and technical supplies for the welded components from the VA Tech-Schwing contract. (*Id*.) The front page of the purchase order states "SEE REVERSE SIDE FOR TERMS AND CONDITIONS."[4] (Ex. 2; Ex. 1004.)

---

[2]The testimony and evidence did not reveal the time frame for Janke's involvement with the project.

[3]During the trial and in the exhibits, the parties referred to the five silos by a variety of names and/numbers. With exceptions of quotations from exhibits, this Decision and Order refers to the silos consistently as the two receiving bin silos, two wet sludge silos, the dry granules silo, or the five silos. At times, they are also referred to the alpha-numeric designation used in the VA Tech-Schwing contract.

[4]Neither party has provided the reverse side of the first page of the purchase order. (*See* Exs. 2 & 1004.)

4

Attachment A of the Schwing-IPS purchase order set forth the following schedule for payments to be made by Schwing based upon IPS's progress on the project. (*Id*. at Attach. A ¶ M.)  Payment was to be made separately for each silo with the following payment milestones:

> 5% of the structure cost upon signed purchase order;
> 35% of structure cost upon order of steel;
> 20% of structure cost upon approval of shop drawings;
> 30% of structure cost upon delivery to the site or completion of
> field fabricated silos;
> 10% of structure cost upon completion of installation; and,
> 100% of installation costs upon completion of installation.

(*Id*. )  A schedule of values for each silo was set forth in the purchase order.  (*Id*.)

The purchase order also set forth a delivery and an "approximate" installation schedule.  (*Id*. at Attach. A ¶ N.)   The five silos were to be delivered no later than December 28, 2001.  (*Id*.)  The two receiving bin silos were to be installed "[a]pproximately" February 1, 2002[5]; the two wet sludge silos were to be installed "[a]pproximately" February 15, 2002, and the dry granules silo was to be installed "[a]pproximately" April 15, 2002.  (*Id*.)  Paragraph N of the purchase order states: "Actual schedule will be dictated by progress on the plant construction contract.  Installation activity will need to be coordinated with the site contractor." (*Id*.)

Jordan Kopac II ("Kopac"), IPS's senior vice president, had significant responsibilities for IPS's contract with Schwing.  During the late summer and autumn of 2001,

---

[5]The purchase order contains typographical errors listing the installation dates as occurring in "2001."  (*See* Ex. 2.)

substantial work was undertaken by IPS. Schwing made progress payments to IPS totaling $595,692.00.

By a November 30, 2001, facsimile, Schwing directed IPS to cease on-site fabrication but to continue shop fabrication of the two receiving bin silos as scheduled. (Ex. 1005.) Schwing further advised IPS that it could continue to deliver and unload materials at the site, and that initial estimates were that the stoppages would extend for 90 days. (*Id*.)

On December 30, 2001, the NSSD suspended work on the project. (*See* Ex. 1005). The parties anticipated a 90-day delay. (*See id*.)

On April 11, 2002, VA Tech inspected IPS's work on the silo parts at IPS and at the NSSD site. Inspection attendees included Crandall and Jon Orr ("Orr") of VA Tech, Brian Dorn ("Dorn") of the NSSD, Kopac and Jim Gaa ("Gaa") of IPS, and Roger Luedke ("Luedke") of Schwing. Luedke summarized the inspection results in an April 12, 2002, e-mail listing 15 "issues" with respect to parts of the five silos. (Ex. 17.) The issues included problems with "small diameter pits," which raised the "concern of weeping streaks of corrosion coming from the pits after painting"; excess welding material which required removal; a need to seal any metal to metal lap seams with continuous welds; problems with the appearance and quality of all welds particularly those that were externally visible; and poor painting of several structural parts – excessive paint runs and incomplete covering of some areas. (*See id*. at ¶¶ 3, 4, 6, 7, 11(A) & 11(B).)

A VA Tech memo also summarizes manufacturing defects in the five silos as disclosed by the April 11, 2002, inspection. (Ex. 18.) In addition, the memo indicates that the

two receiving bin silos (B1610 & B 2610) were "finish painted and ready for delivery - waited on a flat bed-truck" and their manufacturing was 90% complete; the wet sludge silos (B1710 & B2710) were about 50% complete; and the dry granules silo (B1550) was 40% complete. (*Id.*) Sections of the wet sludge silos were at the Waukegan sludge drying facility. (*Id.*) No ultraviolet light damage was found at the time of the April 2002 inspection. (*See* Exs. 17 & 18.)

Contrary to the anticipated 90-day delay, the hiatus lasted until about February 19, 2004, when VA Tech notified Schwing that the NSSD had restarted the project at a new site in Zion, Illinois ("Zion") and that VA Tech expected Schwing to honor its contract. VA Tech did not increase its contractual payment to Schwing.

Schwing contacted IPS, informing it that the project had restarted in Zion, and indicating that Schwing expected IPS to honor their contract. (*See* Ex. 1007.) Miller, who was Schwing's project manager at that time, requested that IPS inform Schwing of additional expenses that IPS might incur as a result of change in the project location. Schwing knew that IPS would have to transport materials from the former Waukegan site to the current Zion site. Schwing also anticipated that IPS would have additional costs due to the delay.

On February 20, 2004, IPS responded with a field service quotation for $21,500. (Ex. 1008.) On March 29, 2004, IPS provided another field service quotation for $189,000. (Ex. 1009.) Item number one of the March 29, 2004, field service specified "a 120' x 120' x 24" deep silo fabrication lay-down area . . . This area to be used for the field fabrication and storage of the [wet] sludge silos and ancillary components that now reside in Waukegan, IL in Zion, IL." (*Id.*)

7

In the spring of 2004, Miller, Crandall, Orr, Kopac, and Brian Jensen ("Jensen"), a representative of the NSSD, had a meeting to view the new project site, coordinate the silo construction site, and discuss scheduling. They viewed three potential lay-down sites for IPS to complete its fabrication: A site to the north of the project; a site to the south of the project; and, a site with an asphalt parking lot which was located one-half mile down the road from the project. Additional costs for relocating the project and transporting the materials were acknowledged by all. Miller encouraged Kopac to present those costs so that arrangements could be made. Kopac informed Miller that the third site was unacceptable and that he would consider the two other potential sites. Kopac indicated that he would contact Miller to advise him of his choice.

After the meeting, Miller received only one telephone call from Kopac but he was not advised of IPS's choice. In an attempt to elicit a response, Miller left a number of messages for Kopac and eventually resorted to calling Jordan Kopac Sr., ("Kopac, Sr.") the president of IPS. After a time, IPS called and declined to participate in the project because the new Zion job site was problematic.

Based on IPS's response, Miller on behalf of Schwing, solicited bids from J. J. Henderson, the general construction contractor for the Zion site, and another company. Because the bids were extremely high in relation to Schwing's contract amount with VA-Tech and the money which Schwing had already paid IPS, on June 10, 2004,[6] Miller wrote and faxed a letter

---

[6]The July 10, 2004, date on the letter is a typographical error.

to IPS, which relates the history of the Schwing-IPS purchase order on the NSSD project. (Ex.

1) The final paragraph of letter states:

> IPS's refusal to honor their original contract has placed Schwing with the financial burden of completing IPS's work. Schwing respectfully requests that IPS immediately resume work per our contract. Should IPS not honor the agreement, Schwing shall expect a refund of all monies paid to complete all remaining work. IPS is liable for the completion of this contract and Schwing shall pursue all legal means to hold IPS accountable.

(*Id.*)

> By letter dated June 11, 2004, IPS responded to Schwing's letter, stating:

> While you are correct in stating that IPS committed to complete performance of the project when it resumed in exchange for payment of services rendered up through suspension of the project, the agreed project was the Waukegan, Illinois site, not a new site in Zion, Illinois. . . . IPS stands ready, willing and able to perform per its contract with Schwing. We are not willing, however, to modify the terms of our contract and commit to the performance at a new site that poses potential pitfalls and complexities that did not exist with respect to the Zion site. From a complexity of performance standpoint, the Zion site, being a full-construction project, is substantially more complex.

(Ex. 4.) Eventually, IPS decided to do the work because IPS did not want to eliminate Schwing as a customer, assurances were given that caused IPS to believe that the situation was workable, and Schwing had threatened to sue IPS.

Under date of July 12, 2004, IPS sent a field service quotation (IPS estimate 1520) to Schwing for the relocation and field erection of the NSSD project from Waukegan to

9

Zion. (Ex 5.) The total quoted price was $264,084.00. (*Id*. at 4). Item 1F of the quotation stated: "IPS to prep laydown area at the Zion NSSD work site near North East corner of property if NSSD or General Contractor does not provide civil work prior to on-site fabrication work." (*Id*. at 2.)

The field service quotation includes three general notes. General note one states: "Additional Costs from the original 2001 job quotation in Waukegan based on an August 2004 start date with the majority of the main & coned silo work expected to be completed by September 30th, 2004." (*Id*. at 4.) General note two states: "IPS has the assurance that NSSD and their designated Zion project General Contractor understands that the IPS labor force in [sic] non-union and is not an issue providing Lake County Prevailing Wages are remitted to various employees or sub-contractors while performing duties on NSSD's Zion and Waukegan properties." (*Id*.) General note three states: "IPS has requested and to-date has not received a Zion Project time lines [sic] from Schwing, NSSD or the General Contractor. Therefore IPS will not be responsible for any monetary penalties on this project caused by unrealistic milestones, delays caused by others or by acts of God." (*Id*.)

A July 15, 2004, letter from Tillman[7] to Orr of VA-Tech states that J. J. Henderson recommended construction of a 65' by 65' concrete pad (lay-down area), to provide a temporary foundation for erection of the silos. (Ex. 6.)

---

[7]In July 2004, Miller left Schwing and Tillman continued as both project engineer and project manager for Schwing.

Schwing presented a proposed change order to IPS for $125,628.00 on July 29, 2004. (Ex. 7.) On July 29, 2004, Tillman sent, by facsimile, an eight-page "classic layout schedule" to IPS which contains a detailed schedule for the progression of the work on the NSSD project. (*See* Ex. 1013.) Activity 3980 provides an early start date of August 11, 2004, and an early finish date of August 12, 2004, for the installation of the "truck receiving bins" – the first two silos to be installed. (*Id*. at Sheet 2.) Activity 1600 calls for an early start and early finish date of September 9, 2004, for the installation of the "FRP" tanks. (*Id*.) Activity 1810 calls for an early start date of December 2, 2004, and early finish date of December 3, 2004, for the installation of the "wet sludge storage silos." (*Id*. at Sheet 3.) Activity 1990 calls for an early start date of December 6, 2004, and early finish date of December 10, 2004, for the installation of the dry granules silo. (*Id*. at Sheet 4.)

The engineering plan established a staggered sequence for the silo installation. (*See* Ex. 1013.) First, the receiving bin silos, which were to be located in the basement, would be installed. Second, after the first floor was in place but before the walls were erected, the two wet sludge silos would be installed. Third, and last, the dry granules silo would be installed on the second or third floor of the building.

On July 29, 2004, IPS responded with a modified proposed change order. The modifications included the insertion of general notes one through three which had been in IPS's July 12, 2004, field service quotation. (Ex. 8 at 2.) IPS increased the change order price to $143,630.00, noted the outstanding purchase order balance of $99,946.00, and quoted a total price of $243,576.00.

11

(*Id*.) IPS expanded the final sentence of Schwing's proposed change order into an additional paragraph which states: "No other changes to this order apply at this time. Access to silo installation area infrastructure for eventual silo placement into the General Contractor[']s facilities or the use of the General Contractor[']s material handling equipment or requirements for the hiring of General Contractor['s] labor personnel has not yet been established by Schwing America Project Manager and must be established. Additional charges may apply if accessibility is delayed or limited, and charges from the General Contractor or unforseen issues arise." (*Id*.)

By an invoice dated August 9, 2004, IPS sought a 30% progress payment of $69,172.00. (Ex. 1016.) The invoice was paid upon Schwing upon receipt.[8] (*Id*.)

On August 12, 2004, Schwing issued a change order which IPS accepted. (Ex. 3.) The change order price was $130,628.00 plus the remaining balance of $99,946.00 on the August 20, 2001, purchase order. (*Id*.) Repainting of 7,000 square feet of the interior of silos B2710, B1710, and B1510 with coal tar epoxy due to ultraviolet light damage was included in change order item number four. (*Id*.) The change order incorporated by reference general notes one through three from IPS's July 12, 2004, field service quotation, and included the final paragraph added by IPS to the change order on July 29, 2004. (*Id*. at 2.)

---

[8]The invoice bears an August 13, 2004, Schwing "received" stamp but has a handwritten notation "paid 8/9/04." (Ex. 1016).

The $130,628.00 change order expenditure was passed through by Schwing, without markup, to VA Tech. The additional $130,628.00 cost, without any markup by VA Tech, was paid by the NSSD.

On August 24, 2004, IPS submitted an additional invoice for a 30% progress payment of $69,172.00, which Schwing paid upon receipt. (*See* Ex. 1019.) The two receiving bin silos were installed at the Zion site on September 8, 2004, as planned. (*See* Ex. 1020.)

Between September 8, and October 29, 2004, Schwing was not aware of much progress by IPS. By e-mail dated September 22, 2004, Kopac inquired of Schwing about the schedule for the delivery of the remaining three silos indicating that the NSSD had stated that "it was looking for the remainder of the silos in the first week of October." (Ex. 1022.) Kopac stated that it was the first he heard of such a schedule and that IPS was "planning/scheduling to be ready the first week in December. Line #?s 1810 and 1990." (*Id*.)[9]

On October 29, 2004, IPS sent an invoice for a 20% progress payment. (Ex. 1024.) Predatsch called IPS upon receipt of the invoice and stated that the underlying work had not been done. IPS agreed. Predatsch did not authorized payment of the invoice.

Predatsch heard reports that IPS was delaying the NSSD project. Predatsch received reports that IPS was not fully staffing the NSSD job site and that IPS only had two men on the site. Schwing began receiving phone calls from Crandall stating that VA Tech would call Schwing's performance bond because the work was not progressing.

---

[9]The line numbers and dates cited by Kopac are contained in classic layout schedule that Schwing provided on July 29, 2004.

As of November 9, 2004, the Zion site was ready for installation of the two wet sludge silos. (Ex. 1025.) The site would not be ready for the dry granules silo until after "structural" was in place. (*Id*.)

Crandall was at the Zion site on November 9, 2004, and only observed two or three IPS employees present. Crandall noted that IPS did not seem to have a full crew for the effort and observed little progress by IPS.

The two wet sludge silos and the dry granules silo remained to be installed by December 2004. At some point, IPS indicated that the two wet sludge silos would be installed by December 20, 2004 (*see* Ex. 1026), but the date passed without the promised installation.

On December 14, 2004, Janke received on-site welding inspection report identifying three areas of concern with IPS's welding procedure. (Ex. 1027.) On December 22, 2004, Janke requested a date for the installation of the silos. (Ex. 1029.) On January 13, 2005, Kopac advised Schwing that the silos would be on "transports" by January 21, 2005, and ready for transportation on January 24, 2005. (Ex. 1031.)

For two weeks during January 2005, at the request of Schwing, Miller was at the IPS work site to place the Zion project back on schedule.[10] Miller found the job site in disarray. The two wet sludge silos were about 50 percent complete – the lower halves of both silos were standing, the top halves of both silos were lying next to them, and there were also some pieces. The area afforded sufficient work space. While Miller was at the site, he did some welding for Schwing on the sliding frames.

_____

[10]Upon leaving Schwing in July 2004, Miller started his own company, Northeast Water Technologies ("NWT").

Before Miller departed, Kopac raised concerns about the road's condition.  Miller, Kopac and Ken Kreason ("Kreason"), J. J. Henderson's on-site supervisor for most of the project, "walked" the northern portion of the road.  They laid out flags to mark areas where Kopac wanted gravel laid before IPS transported the silos from the south side of the site to the main plant.  Miller left the site.

Thereafter, the two wet sludge silos were laid down on low-boy trailers and painted brown in that position.  On January 25, 2005, Predatsch authorized payment of IPS's outstanding October 29, 2004, invoice.  (*See* Ex. 1024.)

Fresh gravel laid down by J. J. Henderson is documented by IPS's photographs. (*See* Ex. 15, 15-3-15-5.)

On February 3, 2005, IPS sent a revised field service quotation which covered "the eventualities that the delays in preparing the site continue for an unforeseen time."  (Ex. 1032.)  The field service quotation proposes additional charges of $43,548.30.  (*Id*.)  Item A is for "[a]dditional road inspections by Trucking company & IPS due to phone calls saying road was complete when it was not."  (*Id*.)

A February 3, 2005, paint inspection by Schwing revealed obvious unpainted stripes of white primer coat on the undersides of the wet sludge silos because they had been painted laying flat on the low-boy trailers, and additional paint-related problems.  (Ex. 1032.) (*See also* Ex. 1033.)

By e-mail dated February 9, 2005, Tillman inquired about the status of the final coating of the wet sludge silos (B1710 & B2710) and stated "[u]ntil the overall paint is within

specifications, IPS is liable for the delay as much as the access road condition." (Ex. 1033.) Tillman also stated "[a]bove photos also show runs from previous paint application, these runs must be repaired prior to the final coat." (*Id*.)

Predatsch felt that IPS's February 3, 2005, proposal of additional charges was improper because it sought the costs of installation which were included in the original purchase order. Schwing decided to terminate the contract because after the repeated delays, it was apparent that IPS was not going to complete the contract for the agreed upon contract price.

By letter dated February 11, 2005, with an attached copy of the project schedule that IPS received on July 29, 2004, Schwing notified IPS that it was cancelling the purchase order for cause. (Ex. 1034.) The letter states that the "schedule details the mandate to complete project requirements including installation of all IPS supplied goods" and requires that the two wet sludge silos (B1710 and B2710) be "installed complete by November 30, 2004," and that the dry granules silo (B1550) be "installed complete mid December 2004." (*Id*.) The letter further states:

> [T]he delays caused by IPS's failure to complete the project within the timeframe stipulated have caused the Owner much concern. Additionally, the Owner confirmed to Schwing America, Inc. that if the project had been completed as originally scheduled, there would have been no additional costs required for the installation of IPS supplied silos as the project site would have accommodated this work quite easily. . . . IPS shall be held liable for any and all costs related to the project's completion, as Schwing America, Inc. moves forward in completing IPS's obligations.

(*Id*. at 1-2.)

Schwing contracted with J. J. Henderson, NWT, Manta Industrial ("Manta") and Prime Coat Corporation ("Prime Coat") to finish the remaining work on the NSSD project and to correct problems on the project. After IPS's termination, Schwing requested that NWT provide a crew to complete the fabrication of the dry granules silo. NWT's work also included transporting four remaining sections of the roof and miscellaneous flanges and steel, the legs and other pieces from Waukegan to Zion. NWT completed the dry granules silo in five weeks.

On March 5, 2005, Schwing paid $67,500 for the work done by NWT, plus an additional $1,000 for project management by Miller. (Exs. 1039 & 1044 (PO Number 45015096).)

On February 14, 2005, Schwing paid $75,250 to J. J. Henderson for labor, equipment, and rigging of the wet sludge silos (B2710 and B1710) into place. (Exs. 1039, 1044 (PO Number 45013110 & Invoice 2222).) In April of 2005, Crandall became a Schwing employee.

On May 10, 2005, Schwing paid J. J. Henderson $45,054.00 for labor, equipment, and rigging of the dry granules silo (B1550) into place. (Ex. 1039.)

On September 1, 2005, Schwing remitted $18,888.78 to NWT for additional work done that it had done, and materials which it had purchased, between April 6, and May 22, 2005. (Exs. 1039, 1041.)    On January 24, 2006,[11] Schwing paid J. J. Henderson an additional

---

[11]Exhibit 1039, which is a summary exhibit, indicates the charge was paid on December 19, 2005. But, Exhibit 1044 includes the invoice dated December 19, 2005, which bears Schwing "received" and "approved" stamps dated January 24, 2006.

$111,211.65. (Exs. 1039, 1044 (Invoice 2234).) Of that latter sum, Schwing claims that only $13,891.32[12] is attributable to IPS's breach of contract.

Schwing received quotes from four companies for painting the silo interiors with coal tar epoxy – material which is very sensitive to ultraviolet light. The silo pieces with coal tar epoxy coating had sustained ultraviolet light damage while awaiting installation. The coating was also chipped when the pieces were transported. Schwing obtained one quote for the exterior painting since it was less difficult than painting the interiors. The painting tasks were more difficult in the building than if the pieces had been lying in a field.

Schwing engaged Manta to sandblast and re-coat the interior of three silos with coal tar epoxy. On December 20, 2005, Schwing paid Manta $202,730.00 for its work. (Exs. 1039, 1042, 1044 (PO Number 45025857).)

Schwing obtained a quote from Prime Coat and hired that company to paint the exteriors of three silos. On December 28, 2005, Schwing paid $42,826.02 to Prime Coat for painting exteriors of the two wet sludge silos and the dry granules silo. (Exs. 1039 & 1044 (PO 45026859).)

Schwing claims that IPS is liable for $467,140 in damages which it incurred as a result of IPS's breach of their contract. (Schwing's Post-Trial Mem. 13.) At trial, Predatsch testified that the additional $2,000 charge by IPS for transporting power pacs from Waukegan to Zion was "acceptable."

_____

[12]Twice at trial, Schwing stated the amount was **$13,891.32**. Once at trial, Schwing stated that amount was **$13,891.13**. The former number is the correct number since that amount added to the other damage amounts totals $467,140.02 which most closely corresponds to the $467,140.00 claimed by Schwing as damages.

18

*Analysis*

The threshold matter for resolution is what law applies to the issues presented. Where jurisdiction is premised upon diversity of citizenship, 28 U.S.C. § 1332, this Court must apply the substantive law of the forum state including the conflict of law rules. *Erie R. R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938); *Klaxon v. Stentor Elec. Mfg.*, 313 U.S. 487, 496 (1941); *Sybron Transition Corp. v. Sec. Ins. Co.*, 107 F.3d 1250, 1255 (7th Cir. 1997).

In the absence of an effective choice of law by the parties, in contractual disputes, Wisconsin courts apply the "grouping of contacts" rule, that is, that contract rights must be "determined by the law of the [jurisdiction] with which the contract has its most significant relationship." *State Farm Mut. Auto. Ins. Co. v. Gillette*, 641 N.W. 2d 662, 671 (Wis. 2002) (quoting *Haines v. Mid-Century Ins. Co.*, 177 N.W. 2d 328, 330 (Wis. 1970)). The contacts to be taken into account to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiations of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties. *Haines v. Mid-Century Ins. Co.*, 177 N.W. 2d 328, 330 (Wis. 1970). These contacts are to be evaluated according to their relative importance with respect to the particular issue. *Id*. If the place of negotiating the contract and the place of performance are in this state, Wisconsin law will usually be applied. *Id*.

Section 401.105 of the Wisconsin Statutes, part of the UCC as adopted, provides that failing an agreement by the parties, where transactions bear "an appropriate relation to this state," Chapters 401 through 411 of the Wisconsin statutes apply. Nonetheless, the Wisconsin

Supreme Court held that the recognition of an "appropriate relations" test for determining applicable law, and the reference of the official Uniform Commercial Code comments to a transaction's "significant contacts" as being factors in the choice of law indicates legislative approval of the *Restatement* rule of "most significant relationship." *See Wilcox v. Wilcox*, 133 N.W. 2d 408, 415 (Wis. 1965).[13]

The parties did not include a choice of law provision in their contract. IPS asserts Wisconsin law should apply. Schwing asserts that the UCC should apply, there are no substantive differences between the versions of the UCC enacted in Illinois and in Wisconsin, and that to the extent differences exist Illinois law should apply. IPS does not counter Schwing's position that the UCC applies to the contract and damages issues and therefore has waived that argument.[14]

---

[13]*Wilcox*, 133 N.W. 2d at 413-13, n.20 (quoting Tentative Draft No. 9, *Restatement (Second) of Conflict of Laws*, § 379), states "'the local law of the state which has the most significant relationship with the occurrence and with the parties determines'" the rights and liabilities of the parties and lists the contacts that determine "'the state of most significant relationship.'" The contacts are: "'Place of the injury; the place of the conduct; the domicile, nationality, place of incorporation and place of business of the parties; and the place where the relationship of the parties is centered.'" *Id.* at 414 (quoting Tentative Draft No. 9, *Restatement (Second) of Conflict of Laws*, § 379a).

[14]Article 2 applies to contracts for the sale of goods for the price of $500 or more. *See* Wis. Stat. § 402.201(1). Under Wisconsin law, to determine whether the UCC applies to an agreement involving the sale of both goods and services, the predominant factor test is used. *Micro-Managers, Inc. v. Gregory*, 434 N.W. 2d 97, 100 (Wis. Ct. App. 1988). The test for inclusion or exclusion [within the UCC] is not whether [contracts] are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g. contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g. installation of a water heater in a bathroom). *Id.* (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974)). *See also, Akrosil Div. of Intern. Paper Co. v. Ritrama Duramark, Inc.*, 847 F.Supp. 623, 627 (E.D. Wis.1994).
Regardless, other courts have applied the UCC to similar transactions. *See e.g., United States v. City of Twin Falls*, 806 F.2d 862,871 (9th Cir. 1986) (upholding determination, under Idaho's codification of the UCC, that contract to purchase and install equipment for separation and disposal of sludge produced in the secondary treatment of waste water was a contract for the sale of goods with an incidental services component) overruled on other grounds as recognized by *Ass'n. of Flight Attendants v. Horizon Air Indus., Inc.*, 976 F.2d 541, 552 (9th Cir.1992).; *Mead Corp. v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1199 (6th Cir. 1981) (upholding determination, under Ohio's codification of the UCC, that contract for the construction of the a coal washing plant and related facilities was a contract for the sale of goods subject to the UCC); *Omaha Pollution Control Corp. v. Carver-Greenfield Corp.*, 413 F.Supp. 1069, 1085 (D.C. Neb. 1976)(applying Nebraska's codification of the UCC to contract for sewage processing plant construction), disavowed on other grounds, *Mann v. Weyerhaeuser Co.*, 703 F.2d 272, 275 (8th Cir. 1983); *Trident Const. Co., Inc. v. Austin Co.*, 272 F.Supp. 2d 566, 572 (D.S.C. 2003) (applying South Carolina's codification of the

The limited evidence regarding the 2001 purchase order and the 2004 change order indicates the contracts were made in Connecticut and Wisconsin, at the parties' respective places of business. The negotiations also apparently took place in those locations, although some of the negotiation of the 2004 change order occurred in Illinois. The performance of the 2001 purchase order was to take place in Wisconsin and in Illinois. Under the 2001 purchase order, 60% of the total contract was payable upon fabrication and all of that work was to be done in Wisconsin. The work on the change order was to be done in Illinois. The NSSD facility was also located in Illinois. IPS is a Wisconsin corporation with its offices located in this state. Schwing is a Minnesota corporation, which is irrelevant for the choice of law analysis. While it is a close question, Wisconsin UCC law applies since it has the most significant relation to the transaction. *See Nat'l Pawnbrokers Unlimited v. Osterman, Inc.*, 500 N.W. 2d 407 (Wis. Ct. App. 1993). Overall, most of the contract work was to be performed in Wisconsin by a Wisconsin corporation. For the same reason, to the extent that there are substantive issues, not governed by the UCC, Wisconsin law also applies.

The parties framed three issues for resolution by the Court: (1) Was Schwing justified in cancelling the contract? (2) Is IPS entitled to a monetary judgement against

---

UCC to "lump-sum" hybrid contract for the provision of "[t]he design, fabrication, and erection" of airplane hangar); *O'Keefe Elevator Co., Inc. v. Second Ave. Props., Ltd.*, 343 N.W. 2d 54, 56 (Neb. 1984) (applying Nebraska's codification of the UCC to contract for sale and installation of wheelchair lift); *Mayflower Farms v. Tech-Mark, Inc.*, 666 P.2d 1384,1387 (Or. Ct. App. 1983) (applying Washington's codification of the UCC to contract to construct and install components of in a cold storage room for the plaintiff's use in his ice cream business).

The Wisconsin Supreme Court has followed the decisions of other jurisdictions construing the UCC, "[i]n part because uniform codes ought be interpreted uniformly." *See House of Stainless, Inc. v. Marshall and Ilsley Bank*, 249 N.W. 2d 561, 567 (Wis. 1977).

Schwing, and if so, in what amount? (3) Is Schwing entitled to a monetary judgment against IPS, and if so, in what amount?

*The Contract*

In evaluating a breach of contract claim, the Court must determine whether a valid contract exists, whether a party has violated its terms, and whether any such violation is material such that it has resulted in damages. *Steele v. Pacesetter Motor Cars, Inc.*, 672 N.W. 2d 141, 144 (Wis. Ct. App. 2003) (citing *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie Co.*, 557 N.W. 2d 67 (Wis. 1996)). "A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." *Steele*, 672 N.W. 2d at 144 (quoting *Restatement (Second) of Contracts* 1 (1981)). As noted stated in *Steele*:

> Non-performance is not a breach unless performance is due. . . .
> When performance is due, however, anything short of full
> performance is a breach, even if the party who does not fully
> perform was not at fault and even if the defect in his [or her]
> performance was not substantial. . . . Non-performance includes
> defective performance as well as an absence of performance.

Id. (quoting *Restatement (Second) of Contracts* at § 235, cmt. b).[15]

In examining the issues framed by the parties, it is necessary to identify the documents which establish the terms of the contract. The testimony and evidence demonstrates that in February 2004, almost $100,000 in payments from Schwing on the purchase order

---

[15]Pre-Uniform Commercial Code case law may be relied upon to aid in interpretation of the UCC unless violative of its specific provisions. *See* Wis. Stat. § 401.103; Official Comment 1, sec. 1-103, UCC).

22

remained outstanding.  IPS had not delivered or installed the five silos and Schwing had not accepted the silos.  *See* Wis. Stat. § 402.301 ("The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract.")

IPS's position that the purchase order was "closed" is not supported by the documentary evidence, and IPS's eventual entry into the change order with Schwing, rather than a new purchase order.  The change order referenced and modified the purchase order.  Upon IPS's acceptance of the change order on August 12, 2004, the purchase order and the change order became the contract between the parties.  *See* Wis. Stat. §§ 402.201(1); 402.202(2); 402.209(1) & (3).

Prior to the issuance and execution of the August 12, 2004, change order, Schwing delivered the classic layout schedule which provided a detailed timeline for the NSSD project and the staggered installation of the silos.  Thus, the condition of general note number three - non-receipt of Zion project time lines - was no longer valid and IPS was bound by the time line provided by Schwing.[16]

Moreover, general note number one, drafted by IPS, states that there was an August 2004, start date "with the majority of the main and coned silo work to be completed by September 30th.[sic] 2004."  Thus, even under general note number one of the change order, IPS's delayed performance was in breach of the contract.  The testimony and evidence presented did not identify what IPS meant by the "main" silo work.   If the main silos included the wet

---

[16]Furthermore general note three only provided that IPS would not be responsible for "any monetary penalties on this project caused by unrealistic milestones, delays caused by others or by acts of God."  No monetary penalties are at issue.  There is also no evidence that any of the conditions - - unrealistic milestones or delay caused by others or by acts of God - - were involved in IPS's deficient performance.

sludge silos, then the majority of the work was incomplete by September 30, 2004. Regardless of the meaning of "main" silos, the majority of the coned silo work was not done by IPS's September 30, 2004, deadline nor was it done by February 11, 2005.

Kopac's suggestion that the scheduled deadlines lacked significance is not credible. The multi-million dollar NSSD construction project required coordinated efforts.[17] To suggest that the eight-page highly detailed schedule had no meaning is contrary to common business sense. The schedule's importance is supported by Tillman's efforts to ensure that IPS had the schedule when it received Schwing's July 29, 2004, proposed change order. Kopac also relied upon the schedule's timeline in his September 22, 2004, e-mail to Schwing indicating that he was planning on being ready to deliver the three silos in the first week in December 2004. The parties' course of performance indicates the importance of the scheduled deadlines. *See* Wis. Stat. § 402.208.

The schedule's significance is also buttressed by the problems resulting from IPS's failure to adhere to the schedule's requirement that the wet sludge silos be placed in the building before the erection of the walls. For example, IPS's delay necessitated rental of a taller and more costly crane for the lift when J. J. Henderson placed those silos.

*Cancellation of the Contract*

IPS asserts that Schwing did not have cause for cancellation of the contract. IPS's reliance upon an allegedly insufficient lay-down area as excusing its delayed performance is not consistent with the evidence. IPS's March 29, 2004, field service quotation specified a larger

---

[17]The Schwing-IPS purchase order also contained a staggered delivery and installation schedule.

lay-down area. But, that specification was eliminated and was **not** part of the August 12, 2004, change order. *See* Wis. Stat. § 402.202. The persuasive and overwhelming testimony was that there was sufficient space at Zion for IPS to work on the two wet sludge silos, as indicated by Miller's ability to perform on-site welding at Zion in January 2005.

Credible testimony also establishes that IPS did not devote sufficient manpower to the NSSD project. Consistent observations were made that too few men were on the Zion job site. IPS's lack of manpower on the site was reported to Predatsch and personally observed by Crandall.

IPS's reliance upon an inadequate road is also not persuasive. Although IPS had previously examined the site, the issue of the access road was not raised by IPS until January 2005. IPS requested that additional gravel be placed on the access road and the road was marked with yellow flags. J. J. Henderson agreed and, as documented by IPS's photographs, laid the additional gravel as requested.

Schwing met its burden of demonstrating that IPS materially breached the terms of the contract by its significant delay in the installation of the wet sludge silos and the dry granules silo. *See* Wis. Stat. § 402.309. *See also*, *Lippert v. Saginaw Milling Co.*, 84 N.W. 831, 833 (Wis. 1901) (holding, under Wisconsin common law, that where plaintiff-buyer cancelled contract for purchase of beans because of defendant-seller's unnecessary delay in delivery, the defendant was liable for damages caused by that delay). The classic layout schedule provided that IPS was to have the wet sludge silos in place in the building as of December 3, 2004, and the dry granules silo in place as of December 10, 2004. Repainting of

7,000 square feet due to damage from ultraviolet light was included as a part of item number four of the change order, and it had not been done as of February 11, 2005.

The two wet sludge silos and pieces of the dry granules silo were at the Zion site as of September 11, or 12, 2004. Therefore, after mid-September 2004, IPS had the Zion fabrication area available at all times. Despite such availability, IPS did not devote sufficient manpower to the project as indicated by the minimal progress which it made. Based on IPS's material delay in its performance, Schwing was justified in cancelling the contract.

### IPS's Damage Claim

IPS did not meet its burden of proving that Schwing breached its contract or that IPS's breaches should be otherwise excused under the terms of the contract. Thus, IPS is not entitled to recover monetary damages from Schwing.

### Schwing's Damage Claim

Schwing was damaged by the breach because it had to complete the work and do so by retaining vendors to honor its own obligations to VA Tech on the NSSD project. IPS claims that Schwing failed to mitigate its damages because Schwing retained companies other than IPS to complete the work on three remaining silos and to correct any problems with IPS's performance.

There is no doubt that the UCC requires mitigation of damages. *See Cates v. Morgan Portable Bldg. Corp*, 780 F.2d 683, 688 (7th Cir. 1985) (citing UCC § 1-106). However, a similar failure to mitigate argument was rejected in *Steele*, 672 N.W.2d at 882, which held that neither the contract nor trial testimony suggested that plaintiff car owner was

26

required to give a defendant car repair shop an opportunity to cure any defect in workmanship. Using the UCC for guidance on the issue of whether the owner had a duty to notify repairer of his dissatisfaction, the court also concluded that the owner had given the repair shop notice of his dissatisfaction. *Id*. at 883.

In this case, Schwing also gave notice of its dissatisfaction with IPS's work by its repeated requests for an installation date for the wet sludge silos, and its complaints about the painting of the silos. *See id.* Schwing was not under any obligation to give IPS another opportunity to perform the contract. *See id* at 882. IPS's repeated failures to perform as agreed provides adequate basis for Schwing's decision to engage other vendors to correct the problems created by IPS's unsatisfactory performance of its contractual obligations. Schwing's duty to mitigate its damages did not require that it allow IPS to repair its defective performance. *See id.* Schwing could properly mitigate its damages by retaining other companies to complete the fabrication and installation of the remaining three silos.

The object of an award of damages is to put the victim in the same place that it would have been had the breach of which it complains not occurred. *See Mayberry v. Volkswagen of America, Inc*, 692 N.W. 2d 226, 233 (Wis. 2005); *Chronister Oil Co. v. Unocal Ref. & Mktg.*, 34 F.3d 462, 464-65 (7th Cir. 1994)(applying the UCC as interpreted under Illinois law & discussing general legal principles). A damage award is intended to compensate the victim for a loss that it would have avoided had the violation not occurred. *Chronister Oil*, 34 F.3d at 466.

A buyer's remedies are outlined in Wis. Stat. § 402.711 which provides:

> Where the seller fails to make delivery or repudiates
> or the buyer rightfully rejects or justifiably revokes
> acceptance then with respect to any goods involved,
> and with respect to the whole if the breach goes to
> the whole contract (s. 402.612), the buyer may
> cancel and whether or not the buyer has done so may
> in addition to recovering so much of the price as has
> been paid:
> (a) "Cover" and have damages under s. 402.712 as to
> all the goods affected whether or not they have been
> identified to the contract; or
> (b) Recover damages for nondelivery as provided in
> s. 402.713.
> (2) Where the seller fails to deliver or repudiates the
> buyer may also:
> (a) If the goods have been identified recover them as
> provided in s. 402.502; or
> (b) In a proper case obtain specific performance or
> replevy the goods as provided in s. 402.716.

Section 402.712 of the Wisconsin Statutes explains:

> (1) After a breach within s. 402.711 the buyer may
> "cover" by making in good faith and without
> unreasonable delay any reasonable purchase of or
> contract to purchase goods in substitution for those
> due from the seller.
>
> (2) The buyer may recover from the seller as
> damages the difference between the cost of cover
> and the contract price together with any incidental or
> consequential damages as defined in s. 402.715, but
> less expenses saved in consequence of the seller's
> breach.

Section 402.715(1) of the Wisconsin Statutes provides:

> Incidental damages resulting from the seller's breach
> include expenses reasonably incurred in inspection,
> receipt, transportation and care and custody of goods

> rightfully rejected, any commercially reasonable
> charges, expenses or commissions in connection
> with effecting cover and any other reasonable
> expense incident to the delay or other breach.

Section 402.715(2)(a) of the Wisconsin Statutes provides that consequential damages resulting

from the seller's breach include: "Any loss resulting from general or particular requirements

and needs of which the seller at the time of contracting had reason to know and which could not

reasonably be prevented by cover or otherwise."[18] "The test for recovering consequential

damages is not whether the seller actually foresaw or contemplated the resulting damages when

it made the contract; instead, the test is whether the seller, knowing or having reason to know

the buyer's needs, could have reasonably foreseen the loss as a probable consequence of a

breach." *Fid. & Deposit Co. v. Krebs Eng'rs*, 859 F.2d 501, 507 (7th Cir. 1988) (citing James

J. White & Robert S. Summers, *Uniform Commercial Code* § 10-4, 389 (1980)). Applying the

Wisconsin UCC law, the court upheld as consequential damages an award of buyer's expenses

in defending third party litigation caused by seller's breach. *Id* at 506-07.

In *Trinkle v. Schumacher Co.*, 301 N.W. 2d 255, 259 (Wis. 1980), an action

brought by a buyer of defective fabric against the seller, the court determined that an award of

consequential damages properly included the costs of the goods purchased, fabrication work

done by two subcontractors, and the buyer's labor costs. The court relied upon the trial court's

---

[18] Consequential damages need not be shown with mathematical precision. *Murray v. Holiday Rambler, Inc.*, 265 N.W.2d 513, 526 (Wis. 1978) (citing Official Comment 4, sec. 2-715, UCC). "Nevertheless, the burden of proving consequential damages is on the buyer, Official Comment 4, sec. 2-715, UCC; he must prove by credible evidence to a reasonable certainty that such damages were suffered and must prove, at least to a reasonable probability, the amount of these damages." *Murray*, 265 N.W.2d at 526. "Damages may not be awarded on speculation or conjecture alone." *Id*.

characterization of the damages as consequential damages and did not analyze that determination. *See Id.*

IPS argues that the UCC cover provisions are inapplicable to Schwing's claims because Schwing did not purchase substitute goods, IPS did not repudiate or fail to make delivery of the goods involved in the purchase order (the silo parts and accessories), and the goods were accepted and never rejected.

In its supplemental post-trial brief, Schwing agrees that the specific "cover" provision, Section 2-712 of the UCC, does not apply because it did not acquire substitute goods. However, citing the general UCC provision that the purpose of the UCC remedies are to place the aggrieved party in as good a position as it would have been if the party had fully performed, Schwing maintains that the UCC provisions still apply to IPS's material breach of the contract and that Schwing is entitled to recover the damages it sustained as a result of IPS's breach including completing fabrication, delivery and installation, and repairing defects.

Schwing does not cite any specific UCC remedy provision pursuant to which it may recover its damages. However, Schwing correctly invokes the underlying philosophy of the UCC that there be at least a fair quantum of remedy for breach of obligations. *See Phillips Petroleum Co. v. Bucyrus-Erie Co.*, 388 N.W. 2d 584, 592 (Wis. 1986) (citing Official Comment 1, sec. 2-719, UCC). In *Leighton Indus., Inc. v. Callier Steel Pipe & Tube, Inc.*, No. 89-C-8235, 1991 WL 18413, *5 (N.D. Ill. Feb. 6, 1991), the court observed "a buyer's damages for breach are determined case by case, and each case must be considered upon its own special circumstances pursuant to sections 2-714 and 2-715 of the UCC. Furthermore, if of a definite

30

amount, incidental and consequential damages may be awarded." (footnote omitted).) In that case, the buyer of steel to fabricate two cyclone furnaces sought incidental damages that included the expense of a metallurgist's inspection and report concerning the composition of the steel pipe that the seller supplied as well as the costs involved in the replacement of the header pipes and consequential damages resulting from third party litigation. *See id.*

In this case, the type of damages sustained by Schwing are most properly characterized as incidental damages. *See Tacoma Athletic Club, Inc. v. Indoor Comfort Sys., Inc.*, 902 P.2d 175, 181 (Wash. Ct. App. 1995) (holding, under Washington's codification of UCC, that costs of repairing dehumidification system in the indoor swimming pool area could be viewed as incidental damages); *Crook Motor Co., Inc. v. Goolsby*, 703 F.Supp. 511, 523 (N.D. Miss. 1988) (upholding determination, under Mississippi's codification of the UCC, that seller of a stolen truck was liable to buyer-dealer for reasonable repairs and other expenses of placing the truck in condition for resale.) Alternatively, although substitute goods were not acquired, actions taken by Schwing could be deemed analogous to "cover." *See Mead Corp.*, 654 F.2d at 1210 & n.19.

With respect to the following damages, Schwing met its burden of proving to a reasonable degree of certainty[19] that such damages are attributable to IPS's breach of their contract: (1) Schwing's March 5, 2005, payment of $68,500 to NWT; (2) Schwing's February 14, 2005, payment to J. J. Henderson of $75,250.00 for labor, equipment, and rigging of the wet sludge silos (B2710 and B1710) into place; (3) Schwing's May 10, 2005, payment to J. J.

---

[19]As a general rule, Wisconsin law requires damages be proven with reasonable certainty. *See Production Credit Ass'n v. Nowatzski*, 280 N.W.2d 118, 124 (Wis. 1979).

Case 2:05-cv-00621-RTR   Filed 09/28/07   Page 31 of 34   Document 32

Henderson of $45,054.00 for labor, equipment, and rigging of the dry granules silo (B1550) into place; (4) Schwing's September 1, 2005, payment of $18,888.78 to NWT (5) Schwing's December 19, 2005, payment to J. J. Henderson of $13,891.32; and, (6) Schwing's December 28, 2005, payment to Prime Coat of $42,826.02 for painting the exteriors of two wet sludge silos and the dry granules silo; and (7) Schwing's December 20, 2005, payment of $202,730.00 to Manta for repainting of the interior of the two wet sludge silos and the dry granules silo with coal tar epoxy. The damages sustained by Schwing as a result of IPS's breach of contract total $467,140.02.

As the prevailing party, Schwing is also awarded costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure.

### Conclusions of Law

Based on the foregoing, the Court concludes, as a matter of law that:

Schwing did not breach its contract with IPS.

IPS materially breached its contract with Schwing, justifying Schwing's cancellation of the contract.

Schwing sustained damages as a result of IPS's breach of contract.

Schwing's damages as a result of that breach are $467,140.02.

### Other Matters

IPS claims that Schwing owes it $2,450.40 for mobilization of two power pacs from Waukegan to Zion. That work was not part of the parties' contract. IPS claims $900 in trucking costs ($300.00 and $600.00 on September 16, and 20, 2004, respectively) as supported

by invoice number 02724 from De Cloux Trucking Co. and IPS's itemization of damages (Ex. 20) which claims labor by two men at the hourly rate of $64.60 for 12 hours for a total of $1,550.40. None of the charges listed on the itemization of claimed damages were submitted to Schwing before IPS filed its action.

At trial, Schwing stipulated that payment of $2,000 to compensate IPS for that work was "acceptable."[20] The trucking charges are documented by independent invoices. However, the claimed labor costs are not supported by any contemporaneous records from IPS. Under the circumstances, IPS has not established that it is entitled to the additional $450.00 in labor costs. Therefore, in accordance with Schwing's trial stipulation, IPS is entitled to recover $2,000 from Schwing to compensate it for the power pac transportation.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. IPS's breach of contract claim is **DENIED**;

2. Schwing's breach of contract counter claim is **GRANTED**;

3. IPS **SHALL** pay damages to Schwing in the total amount of $467,140.02. Such sum compensates Schwing for: (1) $87,388.78 paid to NWT; (2) $134,195.32 paid to J. J. Henderson; (3) $42,826.02 paid to Prime Coat; and, (4) $202,730.00 paid to Manta;

4. Pursuant to Fed. R. Civ. P. 54(d), Schwing is also **AWARDED** costs;

---

[20]In its post-trial memorandum, Schwing argues against payment of the $2,000 to IPS for transporting the power pacs. (Schwing's Post-Trial Mem. 12.) However, at trial, Schwing's agent, Predatsch stated that the $2,000 charge for that work by IPS was acceptable to Schwing.

33

5.      Consistent with Schwing's stipulation, IPS is awarded $2,000 to compensate it for transporting two power pacs for Schwing;

6.      This action is **DISMISSED** and the Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 28th day of September, 2007.

**BY THE COURT**

s/ Rudolph T. Randa
**Hon. Rudolph T. Randa**
**Chief Judge**